**UNITED STATES RUBBER COMPANY**
v.
**UNITED STATES.**
No. 50406.

United States Court of Claims.
April 2, 1958.

---

1. 28 U.S.C.A. § 2401(b).

2. 28 U.S.C.A. § 2679.

Myron Kalish, Brooklyn, N. Y., for plaintiff. Arthur, Dry & Dole, New York City, were on the brief.

Edward L. Metzler, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

PER CURIAM.

This case involves a claim for unemployment compensation taxes paid to the State of North Carolina as a contract cost in the performance of a cost-plus-fixed-fee Government contract. Plaintiff further seeks a declaratory judgment as to other excess taxes not yet accrued.

The Commissioner was directed to make findings of fact and to recommend legal conclusions in the light of the findings of fact under the Rules of this court.

Pursuant to such reference, the Commissioner has submitted his findings of fact and conclusion of law.

The court, after having considered the evidence, the briefs and argument of counsel, adopts the findings and opinion of Commissioner C. Murray Bernhardt with minor changes which are printed below.

Plaintiff is therefore entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

Opinion of the Commissioner

The plaintiff seeks to recover as a contract cost the unemployment compensation taxes which it paid to the State of North Carolina for the years 1944, 1945, 1946, 1948, and 1949, and a declaratory judgment as to other excess taxes not yet accrued, to the extent those taxes exceeded the amounts it would have paid had it not been for the performance of a cost-plus-fixed-fee Government contract in that State during World War II. The difference will be referred to as "excess taxes." Federal Cartridge Corporation v. United States, 1948, 77 F.Supp. 380, 111 Ct.Cl 372, which established a precedent in this area, was followed by a series of decisions by the Appeal Board, Office of Contract Settlement, laying

down useful but not controlling guides in the same field under factual and statutory variations. The court has had more recent occasion to consider the general subject in Houdaille Industries, Inc., v. United States, Ct.Cl., 151 F.Supp. 298. This opinion relates only to the separated issue of liability.

For some years prior to World War II the plaintiff engaged in business in the State of North Carolina to the extent of maintaining a small sales office with about ten employees. In November 1942, plaintiff entered into a cost-plus-fixed-fee Navy contract numbered NOrd–3102 covering the operation of a Government-owned shell loading plant in North Carolina. The contract was terminated for the Navy's convenience on August 14, 1945, subsequently postponed to November 4, 1945, to permit winding up activities, and the parties entered into a termination settlement agreement on March 7, 1947, containing several exceptions to the general release, including the following:

> "(ii) Claims by the Contractor against the Government which are based upon responsibility of the Contractor to third parties and which involve costs reimbursable under the Contract, but which are not now known to the Contractor."

The quoted provision is referred to hereafter as the "unknown claims" clause.

On August 25, 1948, the plaintiff filed a claim for reimbursement of the excess taxes sought here with the Navy Bureau of Ordnance. No findings having been made on the claim, the plaintiff on August 22, 1949, filed an appeal with the Appeal Board, Office of Contract Settlement. During the pendency of that proceeding the Navy filed its findings belatedly on March 20, 1950, it having been stipulated with the Board's approval that the tardy findings be accepted *nunc pro tunc*. On August 17, 1951, after a hearing, the Board rejected the claim (United States Rubber Company v. Navy, 5 App. Bd. OCS No. 324, page 166), whereupon the present suit was filed.

Beginning in 1936, all employers of a specified class in North Carolina, including plaintiff, were subject to the North Carolina Unemployment Compensation Law, later retitled the Employment Security Law (volume 2c, Gen.Stat. North Carolina ch. 96, 1950 recomp.) and were required to pay unemployment compensation taxes to the State Employment Security Commission at a flat rate of 2.7 percent of taxable payrolls (i. e., that part of each employee's annual wages not exceeding $3,000). By amendment, commencing with calendar year 1943, a graduated merit rate of tax contributions was promulgated, ranging from .27 percent to 2.7 percent of the employer's taxable payrolls, entitlement to a merit rate depending on the previous employment experience of the particular employer in accordance with a prescribed statutory formula. The State maintained a separate reserve account for each employer, made up of the total contributions by the employer excepting a small percentage credited to a statewide pooled account, less unemployment benefits paid to that employer's discharged employees.

The statutory computation date for determination of the employer's tax rate for each year was June 30 (changed as of 1946 to July 31) of the year preceding the calendar year to which the tax rate was applicable. In order to qualify for a merit rate (i. e., a rate lower than the 2.7 percent maximum) for a particular calendar year the employer was required to have, as of the computation date governing that year, a reserve account balance of (1) at least five times the largest amount of benefits paid in any one of the three fiscal years preceding the computation date, and (2) at least 2.5 percent of the employer's total taxable payrolls for the same three-year period. The tax rate for each employer meeting those tests was then calculated by taking the percentage ratio borne by the reserve account balance to the total payroll for the stated three-year period, and determining from a table set forth in the law the appropriate tax rate. The tax rate fluc-

tuated within permissible extremes conversely with the percentage ratio.

In North Carolina the unemployment compensation taxes were paid on an employer basis, not on a plant basis. During the period of plaintiff's performance of contract NOrd–3102 its tax rate was computed on the total of its concurrent commercial and war contract payrolls, and credits and debits to its reserve account were also derived from those combined sources. The taxes assessed against the NOrd–3102 payroll were reimbursed plaintiff as contract costs, while plaintiff bore the taxes assessed against its own private payroll. Plaintiff's rates of tax for the years 1944 through 1954, computed upon its combined commercial and war contract payrolls, and the rates which it would have paid had it not been for its performance of contract NOrd–3102, are shown in the following schedule which also shows the amount of excess taxes presently claimed for the years 1944, 1945, 1946, 1948, and 1949:

| Year | Rate of tax actually paid | Rate of tax computed exclusive of war plant experience | Difference claimed |
|---|---|---|---|
| | *Percent* | *Percent* | |
| 1944 | 2.70 | 1.39 | $    319.59 |
| 1945 | 2.70 | .27 | 2,990.78 |
| 1946 | 2.70 | .27 | 7,628.58 |
| 1947 | 2.70 | [1] 2.70 | None |
| 1948 | 2.70 | [1] 1.39 | 18,917.17 |
| 1949 | 2.70 | 1.00 | 23,637.81 |
| 1950 | 2.70 | 2.70 | None |
| 1951 | 2.70 | 2.70 | None |
| 1952 | 2.70 | 2.70 | None |
| 1953 | 2.70 | 2.70 | None |
| 1954 | 2.70 | 2.70 | None |
| | | | 53,493.93 |

[1]. In 1946 plaintiff acquired 2 plants in North Carolina, The Ruby Cotton Mills and the Seaboard-Stevens Company, whose unemployment compensation reserve balance of $66,629.60 was credited to plaintiff's combined reserve account. But for this credit the plaintiff, on the basis of its commercial experience exclusive of its performance of NOrd–3102, would not have been entitled to a merit rate in 1948 or 1949.

---

The principal issues thus presented are (1) whether the release provisions of the final settlement agreement bar plaintiff's recovery and (2), if not, whether the excess taxes claimed are reimbursable costs under contract NOrd–3102.

It is plaintiff's contention that, as of March 6, 1947, the excess taxes were "unknown claims" within the meaning of that exception to the release, and hence not barred. The subject divides itself into the excess taxes for 1944, 1945, and 1946 on the one hand, and those for subsequent years on the other. As to the earlier years, if facts were available but not properly assimilated by plaintiff at the time of the termination agreement, plaintiff's failure to comprehend their significance in terms of recoverable expense does not of itself except them from

the force of the release. The test is not the state of plaintiff's knowledge, but the availability of information which, properly digested, could reasonably be expected to acquaint plaintiff with the existence of a reimbursable cost. At the time of the termination agreement there was information available to plaintiff from data within its possession from which it could compute for each year through 1946 the separate payrolls, tax rates, and taxes for both its commercial operations and its operations under contract NOrd–3102. The plaintiff's failure through inadvertence to recognize the significance of the data does not extricate it from the release. The novelty of the statute and the obscurity of the claim at the time explain but do not extenuate the lapse. It is apparent from a review of the various cases of this type considered by the Appeal Board, Office of Contract Settlement, that several other holders of terminated CPFF war contracts entered into final settlement agreements prior to March 6, 1947, and specifically reserved claims for comparable excess taxes. Plaintiff itself had a similar claim arising under a war contract in the State of Illinois (United States Rubber Company v. Army, 5 App.Bd. OCS No. 313, page 87), in which it appears that as early as 1945 plaintiff was aware of its right to reimbursement for excess taxes brought about by operation of a war risk amendment to the Unemployment Compensation Law of that State which, while not identical with the present situation, resembles it sufficiently to have alerted plaintiff here as to its rights under contract NOrd–3102.

While its constructive knowledge bars plaintiff from recovery of excess taxes paid in 1944, 1945, and 1946, it does not necessarily have the same effect as to excess taxes for 1948 and 1949. From the information contained in finding 26 and footnotes thereto, defendant correctly concludes that, as of March 6, 1947, plaintiff had every reason to know that the swelling deficit in its combined reserve account was the direct consequence of its war contract experience, and to anticipate that the effects would prevent it from entitlement to a merit for some years to come, unless events which were unreasonable to expect in its commercial future in North Carolina would suddenly wipe out the debit balance and create a credit balance large enough to meet the substantial requirements imposed by the State law for a merit rate. But the excess taxes plaintiff claims for 1948 and 1949 would not have arisen had not the plaintiff's segregated commercial experience, divorced from the effects of its war contract, produced a situation governing those years meeting the requirements for a merit rate. Unless, therefore, plaintiff could have predicted on March 6, 1947, that its commercial operations, independent of its war contract operations, would have produced a merit rate in 1948 and 1949, it would have lacked knowledge of one of the two essential prerequisites to excess taxes. Since calculation of the tax rate under the controlling statute required the knowledge of such variable factors as payrolls and benefits paid to discharged employees, both of which in themselves were the products of fluctuating economic conditions and business opportunities, plaintiff's power of prophecy on March 6, 1947, was inadequate to foretell whether or when its segregated commercial activities would entitle it to a merit rate. Accordingly, the excess taxes for 1948 and 1949 were within the "unknown claims" exception to the release and not barred on that account. This determination coincides with the prior ruling of the Appeal Board, Office of Contract Settlement (United States Rubber Company v. Navy, 5 App.Bd. OCS No. 324, page 166), and is consistent with comparable rulings in Hercules Powder Company v. Army, 5 App.Bd. OCS No. 342, page 24, National Gypsum Company v. Army, 5 App.Bd. OCS No. 337, page 43, and Stewart-Warner Corporation v. Army, 5 App. Bd. OCS No. 358, page 60. It also finds support in Houdaille Industries, Inc., v. United States, supra. The fact that a

"state experience factor" was present in the laws of the States of Virginia and Illinois, respectively, which applied in the Hercules and Stewart-Warner cases, and is not present in the North Carolina law controlling the present case, does not make those cases distinguishable.

In superfluous support of the conclusion that the excess taxes for years subsequent to the termination agreement were "unknown claims" excepted from the release, at the time of the negotiations preceding the termination agreement the parties were familiar with and relied on an official memorandum adopted by the War and Navy Departments, set forth in finding 29, which, in interpreting the unknown claims clause, stated that a claim by a third party would not be considered as "now known to the contractor" where it had not been asserted against the contractor up to the time of the settlement agreement. The excess taxes for 1948 and 1949 were not only unasserted by the State of North Carolina up to the time of the settlement agreement, but they were no more known or anticipated at that time by the State than they were by plaintiff.

The next significant issue is whether contract NOrd–3102 made such excess taxes reimbursable. The Federal Cartridge decision, supra, and all of the relevant decisions by the Appeal Board, Office of Contract Settlement, except that rejecting the instant claim, involved the construction of cost-plus-fixed-fee contracts let by the Army, while the present case arises under a Navy contract. In each Army contract so far as the reported opinions, reveal, the cost provisions were closely similar to one another and, as a common denominator, afforded rather comprehensive coverage of all costs attributable to contract performance. In contrast, the provisions of the plaintiff's Navy contract are widely dissimilar to the Army contract language and afford little opportunity of direct comparison. As a general rule a lenient standard of cost allowance is followed in cost-plus-fixed-fee contracts. The contract in Fed-

eral Cartridge Corporation v. United States, supra [111 Ct.Cl. 372, 77 F.Supp. 389], was said by the court to intend that "the contractor should be reimbursed for every sort of expense or liability incurred as a result of the carrying out of the contract," with exceptions not applicable here, and that "Plaintiff was merely running the plant for the Government; the Government was paying all the expenses and paying the plaintiff a fee for running the plant for it." Williston goes so far as to say that—

> " * * * It may be agreed [in cost-plus-fixed-fee contracts] that the cost of this, that, or another thing will not be considered to be a part of the cost of the work. Any provision reciting such an agreement must be specific. All costs not so specifically excluded constitute the cost of the work whether they are specifically mentioned in the contract or not. * * *. (Williston on Contracts, 1945 ed. vol. 9, sec. 46.)"

It is not necessary to subscribe to such prodigality to pass upon the present case, but in matters of cost allowance in cost-plus-fixed-fee contracts the authorities generally reflect a less exacting attitude than that applied to contracts let on competitive bids.

Plaintiff relies principally on the following provisions of its contract:

> "*Federal, State and Local Taxes.*— If the contractor shall pay, directly or indirectly, through inclusion in the price of materials purchased or otherwise, any sales tax, duty, excise tax, use tax, occupational tax, gross receipts tax, or any other similar tax, license fee or charge applicable to the supplies covered by this contract, * * * which tax, license fee or charge must be borne by the contractor because of a specific contractual obligation or by operation of law, the Government shall reimburse the contractor for such payment as an element of cost hereunder; * * *.

498

* * * * * *

"9. The Government shall pay or reimburse to the Contractor the costs and expenses during or with respect to any period in which said plant shall be partially or wholly closed down or operations therein shall be partially or wholly suspended, incurred by the Contractor in connection with carrying into effect said closing or suspension * * *."

In addition, plaintiff relies on the following excerpts from a publication entitled "Explanation of Principles for Determination of Costs under Government Contracts, War Department-Navy Department", published in 1942 (hereinafter referred to as "Explanation of Principles"), which was incorporated by reference into the contract:

"4. The total cost under a contract is the sum of all costs incurred by the contractor incident to and necessary for the performance of the contract and properly chargeable thereto. * * *

* * * * * *

"Other Indirect Shop Costs

"29. Other indirect shop costs include miscellaneous factory expenses not directly attributable to the contract but necessary and incidental to services, operations, plant, equipment or facilities involved in the performance of the contract, such as:

* * * * * *

"(e) Employer's payments to unemployment, old age, and social security funds, not elsewhere included.

* * * * * *

"Administration and Distribution Expenses

"39. This title comprehends all expenses other than those included under "Manufacturing costs" and "Other contract performance costs." These other expenses are incurred in connection with the general administration of the contractor's business and the distribution of the contractor's products, a ratable part of which, by reference to all the pertinent facts and circumstances, may reasonably be held to constitute proper items of cost incident to and necessary for the performance of the contract. * * *

"Administration and General Corporate Expenses

"40. The expenses here contemplated are those related to the general management of the business and, subject to the limitations elsewhere herein described and to the appropriateness of the apportionment used, comprise items of the following nature:

"(a) * * * (3) all incidental employer's payments for unemployment, old age and social security Federal and State funds. * * *

* * * * * *

"(h) State and local taxes (other than income taxes) not elsewhere included."

Neither the contract provision entitled "Federal, State and Local Taxes", nor paragraph 9 of the compensation provisions, both quoted above, specifically or by intendment seem to apply to unemployment compensation taxes paid by the contractor either during or after contract termination. The former was indistinctly designed to relate only to taxes and charges of an enumerated type paid by the contractor on materials or supplies used in contract performance. The latter would require a labored interpretation to accommodate the excess taxes here sought, although it offers some latitude in reimbursing the contractor for costs "incurred by the contractor in connection with carrying into effect" a partial or complete closing down or suspension of plant activities. Since other cost provisions refer specifically to Social Security taxes as items of reimbursable cost, as will be seen they must govern the issue in preference to non-specific provisions

requiring distortion to fit particular situations.

The Appeal Board, Office of Contract Settlement, rejected plaintiff's claim solely on the basis that it did not meet one of the asserted prerequisites under paragraph 4 of the Explanation of Principles, namely, that the expense to be reimbursable must be "properly chargeable" to contract performance. It pointedly avoided passing on whether the excess taxes were "incident to and necessary for the performance of the contract" within the language of that paragraph. Plaintiff's contention was rejected that if a particular cost is incident to and necessary for contract performance, it necessarily must be properly chargeable to the contract because, instead of being a separate test, the requirement that a cost be properly chargeable to the contract is merely the conclusion to be drawn from the fact of the expense being incidental and necessary to contract performance. The Board held that an expense could be both incident to and necessary for contract performance and yet not properly chargeable to the contract, giving as illustration that where a tool is bought for contract performance, it is both incident to and necessary for contract performance, but that part of its total cost represented by its useful post-contract life in the contractor's hands is not properly chargeable to the contract. This is, of course, correct as it applies to a tool, but the unemployment compensation taxes paid by plaintiff are not comparable. Instead of deriving a post-contract benefit from the credits and debits to its reserve account by reason of its war contract, the plaintiff suffered a substantial detriment which was not realized for several years. Defendant's interpretation of paragraph 4 of Explanation of Principles making the term "properly chargeable" an independent criterion of reimbursability may be appropriate to the ordinary situation, but does not apply here.

Moreover, paragraph 29 (e) of the Explanation of Principles makes reimbursable as a manufacturing cost the employer's payments to unemployment compensation funds "not elsewhere included" even though they may not be "directly attributable to the contract but necessary and incidental to * * * performance of the contract", without any requirement that the expense be properly chargeable. And again paragraphs 39 and 40 of the Explanation of Principles make reimbursable as an administration expense the contractor's payment of "State and local taxes (other than income taxes) not elsewhere included" if they "are incurred in connection with the general administration of the contractor's business" and are "incident to and necessary for the performance of the contract." Neither of these paragraphs employs the "properly chargeable" language used in paragraph 4, thus providing a situation for application of the general rule of contract interpretation that the specific will prevail over the general.

■ If, then, the excess taxes need not have been properly chargeable, from an accounting standpoint, to performance of the contract in order to be reimbursable, were they incident to and necessary for performance, which they must be in order to qualify? The term "necessary for" as used here would appear to embrace and include the term "incident to", for it is difficult to conceive that an expense necessary for contract performance is not by the same token incident thereto. It cannot be questioned that performance of the contract necessitated the hiring of adequate personnel, that payment of tax contributions on their taxable wages was necessitated by the laws of the State, and that contract termination made necessary the discharge of employees and produced the consequential effect on plaintiff's reserve account giving rise to a condition depriving plaintiff of the lower tax rates in 1948 and 1949 that it otherwise would have enjoyed. The causal effect of the contract in producing, through successive stages, the result complained of cannot be denied and is not diluted by the intervention of time. The payment of excess

taxes was a derivative necessity, one which resulted as a direct consequence of having taken action which was necessary to perform the contract. Defendant contends vigorously that the excess taxes were the direct consequence of and were levied on plaintiff's private payrolls in 1948 and 1949, and thus were not applicable to contract performance. Of course, plaintiff could have avoided all post-war taxes in North Carolina by the simple expedient of complete withdrawal from commercial operations in the State after termination of its war contract, but it would be unwarranted to construe the contract to prescribe such abstention as a penalty for its performance. Precisely this argument was advanced and rejected in Certain-Teed Products Corporation v. Army, 4 App.Bd. OCS No. 317, where plaintiff recovered excess taxes arising subsequent to contract termination.

■ There are left certain miscellaneous problems raised by defendant. In its answer defendant pleads the statute of limitations and plaintiff's failure to exhaust administrative remedies. Since defendant's brief is silent as to these defenses their abandonment is presumed, so they shall not be treated here except to say they are without merit. Defendant also contends that the excess taxes paid by plaintiff in 1948 and 1949 were the result of its sharply increased commercial payroll caused by its acquisition in 1946 of two operating concerns in North Carolina (footnote 2 to schedule in finding 21). In observing earlier that contract NOrd–3102 not even impliedly can be construed to warrant as a further penalty for its performance plaintiff's complete withdrawal from all commercial activities in North Carolina after termination of the war contract, if it wanted to avoid the impact of excess taxes, this was intended to apply to plaintiff's post-war operations no matter their size and no matter whether the growth was attributable to acquisition of other going enterprises or normal internal expansion.

■ Plaintiff's petition demands judgment for $352,298.24, with interest, representing the total impairment of its reserve account attributable to contract NOrd–3102 (difference between total contributions to the account derived from taxable payrolls under the contract and benefits paid to discharged employees thereunder). Plaintiff concedes that its loss through 1954 in excess taxes paid is $53,493.93, of which $10,938.95 for the years 1944, 1945, and 1946 is barred by the release provision of the final settlement agreement. The remaining $42,-554.98 paid in 1948 and 1949 is a reimbursable cost, together with interest thereon at $2\frac{1}{2}$ percent from the date each disbursement of excess taxes was made for the years 1948 and 1949 (cf. Houdaille Industries, Inc., v. United States, supra, and Certain-Teed Products Corporation v. Army, 4 App.Bd. OCS No. 317, pages 157, 163, 164). Plaintiff also seeks a declaratory judgment that it will be entitled to recover any excess taxes accruing in future years where they are traceable to operations under contract NOrd–3102. Arithmetically the effects of the war contract will not be exhausted until the merit rates earned by plaintiff subsequent to 1954, computed on its segregated commercial activities throughout, amount to $298,833.46 ($352,327.39 less $53,493.93), unless a change in the Employment Security Law occurs. Even if the request for a declaratory judgment were properly pleaded it could not be granted, for this court has no jurisdiction to entertain suits for declaratory judgments. Twin Cities Properties, Inc., Clayton, Missouri v. United States, 81 Ct.Cl. 655.