### E.I. DUPONT DE NEMOURS AND COMPANY, INC., Plaintiff,

v.

### UNITED STATES of America, Defendant.

### No. 99–101 C.

United States Court of Federal Claims.

Nov. 8, 2002.

---

**21.** App. to Pl.'s Resp. to Def.'s Mot. to Dismiss at 64.

**22.** Pl.'s Mot. for Partial Summ. J. at 25.

John McGahren, Newark, NJ, with whom were Minh N. Vu and Michael J. Golden, Washington, DC, for plaintiff.

Lawrence N. Minch, with whom were Acting Assistant Attorney General Stuart E. Schiffer, David M. Cohen and Robert E. Kirschman, Washington, DC, for defendant. Maj. Paul Salussolia, U.S. Army, of counsel.

## OPINION and ORDER

TURNER, Senior Judge.

Plaintiff alleges that defendant breached the terms of Contract No. W–ORD–490 when it refused to reimburse and/or indemnify plaintiff for costs plaintiff incurred pursuant to the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) at the Morgantown Ordnance Works (MOW), an ordnance plant plaintiff built and operated for the United States during World War II (WWII). The case stands on cross-motions for summary judgment.

### I

In 1940, the United States entered into Contract No. W–ORD–490 with plaintiff to construct and operate a chemical production facility in Morgantown, WV for the use of the United States in the war effort. D. Prop. Find. ¶ 1; Pl. Prop. Find. ¶ 1. Under the terms of this cost-plus-fixed-fee contract (CPFF contract), DuPont was to acquire the site (Pl.App. at 6), design and construct the plant (Pl.App. at 7), and staff and operate the plant (Pl.App. at 13); the United States would own the plant and everything produced therein (Pl.App. at 6, 31). In Article III–A(8) of the contract, the parties agreed that

It is the understanding of the parties hereto, and the intention of this contract, that all work under this Title III is to be performed at the expense of the Government and that the Government shall hold [DuPont] harmless against any loss, expense (including expense of litigation), or damage (including damage to third persons because of death, bodily injury or property injury or destruction or otherwise) of any kind whatsoever arising out of or in connection with the performance of the work under this Title III.... [1]

Pl.App. at 14. Excepted from this liability were losses, expenses, damages or liabilities due to failure of DuPont officers or representatives to exercise good faith or due care. *Id.*

Another clause of the contract provided that

1. The Contractor shall be reimbursed in the manner hereinafter described for such of its actual expenditures in the performance of the work under this contract, heretofore or hereafter incurred, as may be approved or ratified by the Contracting Officer and as are included in the following items:

....

k. Losses, expenses, and damages, not compensated by insurance or otherwise (including settlements made with the written consent of the Contracting Officer), actually sustained by the Contractor in connection with the work and found and certified by the Contracting Officer as not having resulted from personal failure on the part of the corporate officers of the Contractor or of other representatives of the Contractor having supervision and direction of the operation of the plant as a whole, to exercise good faith or that degree of care which they normally exercise in the conduct of the Contractor's business.[2]

Pl.App. at 17, 19.

In 1946, the United States terminated the contract and entered into a termination supplement to the contract, Supplement No. 22 (Supp.22). D. Prop. Find. ¶ 11; Pl. Prop. Find. ¶ 24. Unfortunately, neither party has been successful in locating a copy of Supp. 22.

In late 1984, the United States Environmental Protection Agency (EPA) notified DuPont that it was proposing listing MOW

---

1. In this opinion, this provision is referred to as the Indemnification Clause.

2. This is Article IV–A (1)(k), referred to herein as the Reimbursement Clause.

on the National Priorities List for clean-up pursuant to CERCLA. D. Prop. Find. ¶ 17; Pl. Prop. Find. ¶ 38. In January 1985, the EPA requested that DuPont voluntarily participate in clean-up measures at the MOW site; DuPont declined, citing the United States' responsibility for clean-up under the contract. D. Prop. Find. ¶¶ 21, 22; Pl. Prop. Find. ¶ 39. On April 20, 1990, DuPont and the EPA entered into a consent order by which DuPont (along with several other potentially responsible parties) agreed to conduct a remedial investigation and feasibility study regarding the site. D. Prop. Find. ¶ 24; Pl. Prop. Find. ¶ 41. DuPont paid attorneys and environmental consultants for the investigation and study an amount totaling $1,322,334.83 in costs.[3] Pl. Prop. Find. ¶ 42. Pursuant to the requirements of the Contract Disputes Act (CDA), plaintiff filed a claim with the Contracting Officer for the Army Corps of Engineers in 1993. D. Prop. Find. ¶ 26; Pl. Prop. Find. ¶ 43. After receiving no response within 60 days (a "deemed denial" under the CDA) (Pl.Prop. Find.¶ 45), DuPont filed suit in the United States Court of Federal Claims. Thereafter, defendant expressed a willingness to negotiate a settlement and plaintiff voluntarily dismissed its case. D. Prop. Find. ¶ 41; Pl. Prop. Find. ¶ 49.

Defendant identified David Schwegler of Army Material Command (AMC) as the appropriate Contracting Officer (CO) to review DuPont's claim. Compl. (3/2/99) ¶ 47. On July 12, 1995, CO Schwegler issued a letter that plaintiff now characterizes as a decision regarding its claim and defendant characterizes as a settlement offer. Pl. Prop. Find. ¶ 53; D. Prop. Find. ¶ 44. In any event, plaintiff disputed the amount of reimbursement due as set forth in the July 12, 1995 letter, and CO Schwegler rescinded the terms of that letter. D. Prop. Find. ¶ 46; Pl. Prop. Find. ¶ 53. The Defense Contractors Audit Agency (DCAA) conducted an audit of DuPont's claim at the request of CO Schwegler. Pl. Prop. Find. ¶ 61.

3. In this lawsuit, DuPont also claims interest as provided by 41 U.S.C. § 611(f). Compl. (3/2/99)

Plaintiff filed the complaint initiating this case on March 2, 1999. Plaintiff then moved for partial summary judgment on March 30, 2001; defendant filed a cross-motion for summary judgment on May 9, 2001. In the briefing that followed those motions, plaintiff argued that, although Supp. 22 had not been located, the Federal Rules of Evidence provided for proof of the contents of lost documents through secondary evidence. Pl. Br. (3/30/01) at 15. Accordingly, plaintiff argued that it could prove that Supp. 22 preserved the Indemnification and Reimbursement Clauses contained with the original contract. *Id.* Therefore, plaintiff asserted, the government was ultimately responsible for the costs plaintiff had incurred in responding to the Environmental Protection Agency's CERCLA claims. *Id.* at 23. On the other hand, defendant first argued that Supp. 22 could not be proved to preserve the original contract's Indemnification Clause. D. Br. (5/9/01) at 19. Defendant also asserted that even if both the Indemnification and Reimbursement Clauses could be proved to be preserved by Supp. 22, that neither would apply to CERCLA costs because (1) the Indemnification Clause did not specifically include such costs, *Id.*, (2) the liability for CERCLA costs accrued long after the performance of the contract had ended and such costs were not provided for in the contract, *Id.* at 20, and (3) the Anti–Deficiency Act and its predecessor legislation prohibited an open-ended indemnification clause such as the one alleged to be in this contract, *Id.* at 27. We address each argument below.

II

The summary judgment process is "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56; *Anderson v. Liberty Lobby,* 477 U.S. 242,

at 16.

247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The issue for resolution presented by the parties' cross-motions is essentially one of contract interpretation, an issue generally considered appropriate for summary judgment. *See Comtrol, Inc. v. United States,* 49 Fed.Cl. 294, 299 (2001). In interpreting a contract, a court must first look to the plain language of the contract. *See Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir. 1991). In this case, given that Supp. 22 has not been located by either party, Federal Rule of Evidence 1004 provides for use of secondary evidence to prove the terms of the missing document. Here, the court must first decide which evidence is appropriate for determining the contents of Supp. 22, and then interpret the relevant provisions of Supp. 22 and of the original contract.

### III

Article IV–A (1)(k) of Contract No. W–ORD–490 (the Reimbursement Clause) provided that defendant shall reimburse plaintiff for "[l]osses, expenses, and damages ... actually sustained by the Contractor in connection with the work" on the contract, excluding those losses caused by the Contractor's own negligence or bad faith. Pl.App. at 19. Plaintiff asserts that pursuant to this clause, reimbursement of CERCLA costs is the government's responsibility. Pl. Br. (3/30/01) at 23. Defendant asserts, however, that Supp. 22 contained no provisions for indemnification of such costs. D. Br. (5/9/01) at 19. Plaintiff asserts that Supp. 22 did not discharge the reimbursement or indemnity responsibilities of defendant contained in the original contract. Pl. Br. (3/30/01) at 14.

As proof of the contents of Supp. 22, defendant would have the court rely solely on an Extract from the contract (the Extract), found in a memorandum dated December 23, 1946 from Lt. Col. J.W. Jones, Office of the Inspector General of the War Department. D. Br. (5/9/01) at 20 (citing Pl.App. at 325–26). This Extract contains Article 4(c)(1)(a), 4(c)(1)(b), 4(c)(3) and Article 5(a)(2) of Supp. 22.[4] Pl.App. at 325–26.

The Extract shows that Article 4(c) of Supp. 22 released both parties from all liabilities under the contract with the exceptions of: (c)(1)(a)—claims by third parties against the contractor listed in an attached Schedule A, (c)(1)(b)—claims relating to employment, and (c)(3)—claims by the contractor against the Government for liabilities to third parties not then known by the contractor.[5] *Id.* Article 5(a)(2) estimated the total payments arising under Article 4(c)(1) and (3) and Article 5 to be $1,000,000. *Id.* Neither plaintiff nor defendant suggests that the Extract mentions any general indemnification of any other potential contractor expenses.

Defendant's argument that the contents of the Extract represent all exceptions to the general release of liability found in Article 4 is unpersuasive. Defendant takes the position that a listing of provisions that begins with "c" and skips from "1" to "3" is complete. We reject this argument. Additionally, we note that it is extremely likely that only Article 4(c)(1) and 4(c)(3) were listed (excluding other provisions of Article 4(c)) because Article 5(a)(2), which was also listed, referenced only those two provisions of Article 4(c); listing other provisions of Article 4(c) would have been extraneous. Finally, the document itself purports to be only an "extract" of Supp. 22. The Oxford English Dictionary defines "extract" as a "passage copied out of a book, manuscript, etc.; an excerpt, quotation." Oxford English Dictionary 611 (2d ed.1989). By definition, the word "extract" connotes a part of a whole. We conclude that the contents of the Extract of Supp. 22 do not represent the entire agreement of Supp. 22.

While defendant suggests that the Extract is the only reliable evidence of the contents of Supp. 22, plaintiff asserts that there are at least nine other separate documents that

---

4. The Extract also contains an extraneous "(2)(a)" in the middle of the page, but we believe this to be a typographical error.

5. For purposes of this opinion, we shall refer to Article 4(c)(3) as the Unknown Claims Clause.

Defendant acknowledges that this would preserve as reimbursable those things reimbursable under the original contract. Def. Br. (7/12/01) at 4.

suggest that Supp. 22 preserved the Contract's indemnity covenant found in Article IV–A (1)(k) and the reimbursement guidelines found in Article III–A (8). Pl. Br. (3/30/01) at 16–20. Eight of these can be grouped into four classes of documents as follows: (1) a form to be used for drafting termination supplements for several of DuPont's ordnance contracts, including the MOW contract, which was approved by the DuPont Legal Department and Executive Committee (the Form) (Pl.App. at 273); (2) the termination supplement form contained in the Joint Termination Regulations in use by the War and Navy Departments as of November 1, 1944 (the JTR Form) (Pl. Addendum of 3/30/01 at A–20–21); (3) executed termination supplements of three other DuPont ordnance contracts, including the supplement for one of the contracts (the Gopher Ordnance Works contract) mentioned in addition to the MOW contract on a memo from DuPont's Executive Committee noting approval of the Form for use in termination settlements (Pl.App. at 261, 304–05, 227–28, 290–91); and (4) executed termination supplements of ordnance contracts between the government and three other contractors (Pl. App. at 238–41, 213–14, 248–49).

These four types of documents share common language regarding the indemnification provision found in the original contract. With the exception of a termination supplement for a contract between the Ford Motor Company and the United States (Pl.App. at 238–41) and the JTR Form (Pl. Addendum of 3/30/01 at A–20–21),[6] each of the above-referenced documents contains identical language stating as follows:

> (c) Upon payment of said sum of $ [_____] as aforesaid, all rights and liabilities of the parties under the Contract and under the Act, insofar as it pertains to the Contract, shall cease and be forever released except:
>
> . . . .
>
> (7) All rights and liabilities of the parties under the contract articles, if any, applicable to options (except options to continue

or increase the work under the Contract), covenants not to compete, covenants of indemnity, and agreements with respect to the future care and disposition by the Contractor of Government-owned facilities remaining in his custody.[7]

Defendant's sole argument that these documents should not be considered reliable for proving the contents of Supp. 22 is that " '[e]ach government contract stands by itself,' " so evidence of the Preservation of Indemnity Clause's inclusion in other contracts cannot prove its inclusion in Supp. 22. Def. Br. (5/9/01) at 19, (quoting *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed.Cir.1987)). We agree that plaintiff has the burden of proving the contents of Supp. 22; however, we cannot agree that these documents should be discounted in favor of an Extract as the only reliable source of such proof.

Plaintiff has put forth eight documents with nearly identical language preserving the contract's original Indemnification Clause. Additionally, plaintiff has produced a letter to DuPont from Lt. Col. Meldrum, the Contracting Officer of the Ordnance Department of the War Department, dated September 24, 1946. Pl.App. at 314. This letter responds to DuPont's inquiry regarding the interpretation of certain language contained in the termination supplements for several contracts, including the MOW contract at issue in this case and the Gopher Ordnance works contract. *Id.* The CO clarified that the government was obligated "to reimburse the Contractor for costs and expenses (determined in accordance with the reimbursement provisions of said original contracts as heretofore amended) incurred by the Contractor by reason of or in connection with the claims excepted under paragraph (c) of Article 4 of said supplemental contracts . . . ." *Id.* This letter demonstrates that all the termination supplements referred to therein contained the same provisions in Article 4, paragraph (c). Were it otherwise, the CO would have provided different clarifications of the mean-

---

6. The JTR Form and the Ford Motor Company contract contain only minor changes in wording that do not affect the meaning of the clause.

7. In this opinion, the quoted clause is referred to as the Preservation of Indemnity Clause.

ings of the different provisions. As noted above, the termination supplement to the Gopher Ordnance works contract undisputably contains the Preservation of Indemnity Clause. This is further evidence that the same clause was contained in the MOW termination Supp. 22.

Finally, we note that defendant offers no evidence to dispute plaintiff's assertion that the Preservation of Indemnity Clause was included in Supp. 22. Defendant simply asserts that proof of the Clause's inclusion in other documents is insufficient to prove its inclusion in Supp. 22. We disagree.

■ Federal Rule of Evidence 1004 specifically provides for the use of secondary evidence to prove the existence and terms of a document, the original of which has been lost or destroyed, except when the proponent of the document lost or destroyed it in bad faith. Fed.R.Evid. 1004. As both parties agree that Supp. 22 cannot be located after a good faith search, *see* Joint Status Report (2/20/01) at 2, we conclude that the original of Supp. 22 has been lost or destroyed and that there is no evidence of bad faith in connection with such loss or destruction. Therefore, to prove the contents of Supp. 22, it is appropriate to view secondary evidence such as the Extract, other termination supplements, the Form provided to plaintiff by defendant, the regulations containing sample clauses typically included in termination agreements, and the letter from the government's CO. For the foregoing reasons, we conclude that Supp. 22 contained the Preservation of Indemnity Clause with language identical or similar to the following:

Upon payment of said sum of $ [_____] as aforesaid, all rights and liabilities of the parties under the Contract and under the Act, insofar as it pertains to the Contract, shall cease and be forever released except:

. . . .

All rights and liabilities of the parties under the contract articles, if any, applicable to options (except options to continue or increase the work under the Contract), covenants not to compete, covenants of indemnity, and agreements with respect to the future care and disposition by the Contractor of Government-owned facilities remaining in his custody.

## IV

■ Because we conclude that Supp. 22 contained the aforementioned Preservation of Indemnity Clause, we must determine the effect of that clause on the government's responsibilities under the original contract.

A contract is inherently an allocation of risks between the contracting parties. In the instant case, it is obvious from the broad language used in the Reimbursement and Indemnification Clauses of the contract that, in exchange for the contractor's performance during a time of critical need, the government agreed to an allocation of risks that put those burdens primarily upon itself.[8] Now, the government claims it did not assume the particular risk of liability for CERCLA costs, a liability created by the government itself. Although the issue has arisen in at least two district courts,[9] the precise issue under dis-

---

**8.** Article III–A (8) of the contract states that *"all work . . . is to be performed at the expense of the Government"* and that the government would hold the contractor harmless for *"any* loss, expense . . . , or damage . . . *of any kind whatsoever* arising out of or in connection with the performance of the work under this [contract]." Pl. App. at 14. Article IV–A (1)(k) states, without exclusions (other than the Contractor's bad faith or lack of care), that "[l]osses, expenses, and damages . . . actually sustained by the Contractor in connection with the work" would be reimbursed by the government. Pl.App. at 19.

**9.** *See Tucson Airport Auth. v. Gen. Dynamics,* 136 F.3d 641 (9th Cir.1998); *Elf Atochem N. Am. v. United States,* 866 F.Supp. 868 (E.D.Pa.1994).

In *Tucson,* the Ninth Circuit affirmed the district court's dismissal of a counter-claim against the government on jurisdictional grounds, stating the suit would be proper in the Court of Federal Claims. *See Tucson Airport Auth.,* 136 F.3d at 648. The counter-claim alleged governmental responsibility for indemnifying a WWII-era government contractor for CERCLA liability. *Id.* at 644.

Plaintiff has advised of a recent opinion of the Ninth Circuit in *Cadillac Fairview/California v. Dow Chemical Co.,* 299 F.3d 1019 (9th Cir.2002), in which the appellate court recognized that an indemnity provided by the United States to Dow under a World War II-era styrene plant operation agreement could be considered as an equitable factor in determining whether 100 percent of

cussion is one of first impression in this court.[10]

Plaintiff asserts that either of the two provisions in the original contract would require the government to indemnify it for costs imposed pursuant to CERCLA. Plaintiff argues that the broadness of the language in these two clauses of the contract evince a specific intent for the government to bear all risks associated with the contract.

In *Elf Atochem,* the district court was faced with a situation similar to our current case, except that the indemnifying party was the contractor, not the government.[11] *See Elf Atochem N. Am. v. United States,* 866 F.Supp. 868 (E.D.Pa.1994). Briefly, Elf and the EPA settled claims for CERCLA liability, Elf sued the United states for contribution, and the United States counter-sued based on an indemnity clause contained in a contract for the manufacture of DDT during World War II.[12] *Id.* at 869. The court determined that an indemnification clause written prior to CERCLA could be interpreted to cover CERCLA liability if the language was either (1) specific enough to include such costs or (2) broad enough to include any and all environmental liability. *Id.* at 870 (citing *Beazer East v. Mead Corp.,* 34 F.3d 206, 210 (3d Cir.1994), *cert. denied,* 514 U.S. 1065, 115 S.Ct. 1696, 131 L.Ed.2d 559 (1995)). The court held that if "there is limiting language, the clause does not cover CERCLA." *Id.* at 870–71. The indemnity clause language in *Elf Atochem* limited the contractor's liability to "accidents or injury to persons or property," and therefore was not construed to cover

CERCLA costs. *Id.* at 871. However, the case plainly stands for the proposition that a pre-CERCLA indemnification clause that is broadly written may indeed be interpreted to cover CERCLA costs.

Although not binding precedent in a case before this court, we view *Elf Atochem* as instructive in reviewing a case of first impression. The indemnity language in *Elf Atochem* is much narrower than the language in the Indemnification and Reimbursement Clauses we are construing. Incontrovertibly, a clause holding a contractor harmless for "any loss, expense . . ., or damage . . ., of any kind whatsoever," Pl.App. at 14, must be interpreted more broadly than a clause holding the contracting party harmless for "any liability whatsoever because of accidents or injury to persons or property." *Elf Atochem,* 866 F.Supp. at 870.

In *Elf Atochem,* the district court compared the indemnity clause in its contract with that found in *Olin Corp. v. Consolidated Aluminum Corp.,* 807 F.Supp. 1133 (S.D.N.Y.1992), *aff'd,* 5 F.3d 10 (2d Cir.1993), which released "all claims of any nature which [the contractor] now has or hereafter could have against [the other contracting party.]" *Elf Atochem,* 866 F.Supp. at 871. The *Elf* court agreed with the *Olin* court's assessment that such a broad clause would cover CERCLA liability. *Id.*

As noted above, this court's predecessor had occasion to review similar reimbursement clauses in other WWII-era contracts. In *United States Rubber Co. v. United States,* 142 Ct.Cl. 42, 160 F.Supp. 492 (1958),

---

CERCLA response costs were properly allocated to the government. *Id.* In that case, the validity of the contract indemnity clause was not at issue; the sole basis for the appellate court's decision was the liability-allocation provision of CERCLA. *Id.* Because we must actually resolve the validity and enforceability of the Indemnification Clause, *Cadillac Fairview* has no application here.

**10.** The Court of Claims (our predecessor) dealt with cases interpreting similar reimbursement clauses in WWII-era contracts. Two cases in which that court held the government liable for reimbursement involved contractors seeking increased unemployment compensation taxes incurred because of increased unemployment claims after shutting down plants when their war contracts were terminated. *See United States Rubber Co. v. United States,* 142 Ct.Cl. 42, 160

F.Supp. 492 (1958); *Houdaille Indus., Inc. v. United States,* 138 Ct.Cl. 301, 151 F.Supp. 298 (1957).

**11.** This difference is of no consequence concerning the question whether the clause may be applied to CERCLA liability. However, it is important in Section VI *infra,* pertaining to provisions of the Anti–Deficiency Act, as that applies only to clauses concerning government indemnification of the contractor.

**12.** Under this clause, Elf agreed to hold the United States harmless for "any liability whatsoever because of accidents or injury to persons or property occurring in the operation or use . . . ." *Elf Atochem,* 866 F.Supp. at 870.

and *Houdaille Industries Inc. v. United States,* 138 Ct.Cl. 301, 151 F.Supp. 298 (1957), the former government contractors sought reimbursement of increased unemployment compensation taxes incurred in each of several years following the termination of their wartime contracts. In both cases, reimbursement was granted after review of the contractual language. In *United States Rubber Co.,* the court declared "a lenient standard of cost allowance is followed in cost-plus-fixed-fee contracts" and that all costs that were not specifically excluded by the contract would be considered reimbursable. *United States Rubber Co.,* 142 Ct.Cl. at 49, 160 F.Supp. at 497.

The Eighth Circuit had occasion to review an indemnification clause identical to the one in the MOW contract. *See United States v. United States Cartridge Co.,* 198 F.2d 456 (8th Cir.1952), *cert. denied,* 345 U.S. 910, 73 S.Ct. 645, 97 L.Ed. 1345 (1953). The indemnification clause in that CPFF contract was interpreted broadly enough to cover even the filing of false claims. *Id.* at 464–65.

Plaintiff argues that *United States Rubber Co., Houdaille,* and *United States Cartridge Co.,* taken together, stand for the proposition that reimbursement and indemnification clauses found in such CPFF contracts should be interpreted to cover costs and liabilities not specifically excluded in the contract and that such an interpretation is consistent with the contractual intent of the parties that the government should bear all costs and risks associated with the contracts. Pl. Br. (6/20/01) at 10. We agree that such an interpretation represents the intention of both parties that the contractor would emerge from the contract in no worse position than upon its entrance.

The remaining question is whether the language in the presently-considered clauses "shows an intent to allocate all possible liabilities among the parties." *Elf Atochem,* 866 F.Supp. at 870. For that, we must look to the contractual language and the circumstances surrounding the contract.

In addition to the verbiage holding plaintiff harmless for "any loss, expense . . ., or damage . . ., of any kind whatsoever," the Indemnification Clause states the clear "intention of this contract, that all work . . . is to be performed at the expense of the Government." Pl.App. at 14. The only exception that the government found it necessary to include was for any "loss, expense, damage or liability . . . due to the personal failure on the part of . . . the Contractor . . . to exercise good faith or that degree of care which they normally exercise in the conduct of the Contractor's business." [13] *Id.* Certainly, the government could have carved out other exceptions if it intended to avoid liability for other costs. It did not.

Based on the foregoing, we conclude that the Reimbursement and Indemnification Clauses in the MOW contract were drafted broadly enough to be properly interpreted to place the risk of unknown liabilities on the government, including liability for costs incurred pursuant to CERCLA.

## V

Defendant argues that the government should not bear liability for plaintiff's CERCLA costs because those costs were incurred many years after the termination of the MOW contract and, therefore, those costs are too attenuated. D. Br. (5/9/01) at 9. Plaintiff responds that the temporal relationship between cost and contract performance is irrelevant. Pl. Br. (6/20/01) at 8. We agree that a causal relationship, rather than a question of timing, is the dispositive issue.

■ We concur with the Court of Claims opinion in *Houdaille,* that expenses arising after termination of the contract but "on account of the contractor's performance under the contract," are reimbursable so long as the reimbursement clause does not limit itself to costs arising during the performance of the contract. *Houdaille,* 151 F.Supp. at 312–14. The contract in question contains no such limitation.

---

**13.** There has been no allegation or suggestion of bad faith or lack of due diligence on the part of plaintiff.

■ As there is no allegation that the events causing plaintiff's environmental liability occurred as a result of activities conducted at any time other than during the operation of the plant on behalf of the government, we must assume that plaintiff's CERCLA liability arises "out of or in connection with the performance of the work under this [contract]." Pl.App. at 14, Article III–A(8). Accordingly, a causal relationship exists and the interpretation of the Indemnification Clause as including assumption of liability for those costs is appropriate.

## VI

■ Defendant's final argument against its liability for plaintiff's CERCLA costs, and one we must reluctantly accept, pertains to the Anti–Deficiency Act, 31 U.S.C. § 1341, (ADA) and its predecessors. The ADA provides in pertinent part that an "officer or employee of the United States Government ... may not... (B) involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law ...." [14] 31 U.S.C. § 1341. Defendant asserts that an open-ended indemnification clause violates the ADA because it obligates funds without an appropriation and, therefore, the Indemnification Clause in this contract should not be construed as authorizing broad and open-ended indemnification of post-termination costs. D. Br. (5/9/01) at 27. Plaintiff argues that the ADA does not apply to the Indemnification Clause in this contract because it falls under the "authorized by law" exception. Pl. Br. (6/20/01) at 20.

As discussed in Sections IV and V *supra*, we conclude that the Indemnification Clause was written to place the risk of virtually all liabilities and the burden of practically all costs on the government. This is, of course, a broad interpretation that provides no cap for indemnification costs. We now evaluate whether this violates the ADA, and, if so, the resulting effect on the validity of this clause.

The question whether an open-ended indemnification clause violates the ADA has been reviewed before. In *Hercules Inc. v. United States,* 516 U.S. 417, 116 S.Ct. 981,

134 L.Ed.2d 47 (1996), the Supreme Court had occasion to visit the issue in the case of a government contractor that produced Agent Orange for use in the Vietnam War who sought to imply a covenant of indemnity into the contract. Chief Justice Rehnquist delivered the opinion of the court, finding the ADA's bar on open-ended indemnification clauses to be "strong evidence" that such a clause was not intended to be implied. *Hercules,* 516 U.S. at 427–28, 116 S.Ct. 981. Similarly, the Court of Claims found in *California–Pacific Utilities Co. v. United States,* 194 Ct.Cl. 703, 715, 719–21 (1971), that a government contract could not be reformed to include an indemnification provision because "it would constitute the obligation of funds not yet appropriated."

■ Additionally, another judge of this court reviewed the issue at length in *Johns–Manville Corp. v. United States,* 12 Cl.Ct. 1 (1987). We find the discussion therein instructive. In *Johns–Manville,* asbestos manufacturers sought indemnification from the government for damages paid on claims for asbestos-related diseases suffered by shipyard workers during World War II. The court found the ADA to be a bar to inferring an indemnification clause in these contracts. *Id.* at 33–34.

An in-depth review of *Johns–Manville* is appropriate as plaintiffs there presented two of the same arguments that DuPont presents now, including (1) that the First War Powers Act, Pub.L. No. 77–354, 55 Stat. 838 (1941), and Executive Order No. 9,001, 6 Fed.Reg. 6787 (Dec. 27, 1941), authorized the entering into contracts without regard to the ADA, and (2) that the contemporaneous legal climate was one that accepted as valid open-ended indemnity by the government for contractors immersed in the war effort. *Id.* at 24. The trial judge refuted both of these assertions. *Id.*

The plaintiffs in *Johns–Manville* argued that then-recent legislation empowered government officers to contract during the wartime emergency notwithstanding the usual regulations and prohibitions in place. *Id.* at 23. DuPont also places great weight on this

---

**14.** The relevant predecessor to the ADA con-   tained essentially the same terms.

argument. Pl. Br. (6/20/01) at 20. The First War Powers Act granted the president the power to allow departments or agencies involved in the war "to enter into contracts and into amendments or modifications of contracts ... without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts ...." 55 Stat. at 839. We agree with the opinion in *Johns–Manville* that if this were the only germane provision, it could be construed to make the ADA's prohibitions on open-ended indemnification clauses irrelevant to wartime contracts. However, the president delegated this grant of authority to the Navy and War Department and the United States Maritime Commission by Executive Order 9,001. This Order unequivocally limited the Act by delegating contracting authority only "within the limits of the amounts appropriated therefor ...." 6 Fed.Reg. 6787. This is a clear reference to the limitations imposed by the ADA, so we cannot assume that this prohibition was intended to be lifted; in fact, as Judge Miller did, we must assume the contrary.

Additionally, the plaintiffs in *Johns–Manville*, as well as our plaintiff, pointed to an opinion of the Attorney General that viewed open-ended indemnification clauses as acceptable under the First War Powers Act and Executive Order 9,001. 40 Op. Atty. Gen. 225 (1942), Pl. Supp.App. at 498–508. Plaintiffs in both cases contended that wartime exigencies presented a situation in which the Attorney General was willing to interpret the law broadly enough so as not to preclude such indemnity provisions. However, as Judge Miller stated:

> Nevertheless, that the Attorney General and other government officials, in their honest efforts to facilitate the war effort, may have misunderstood or ignored the limitations on powers to contract and genuinely believed unlimited indemnification agreements to have been valid and essential does not render them valid or enforceable in the face of contrary language in Exec. Order No. 9,001.

*Johns–Manville*, 12 Cl. Ct at 24.

Of course, *Hercules, California–Pacific*, and *Johns–Manville* all dealt with an at-tempt to *imply* an indemnity provision in contracts that did not expressly provide for indemnification. This court queried whether the *DuPont* case presented an issue that could be sufficiently distinguished because the contract *expressly* included a broadly-worded Indemnification Clause. A review of Comptroller General opinions convinced us that this is a distinction without a difference.

In 1928, the Comptroller General of the United States reviewed a contract between the United States and the Alabama Power Company that included an open-ended indemnity provision. *See* 7 Comp. Gen. 507 (Feb. 21, 1928). The Comptroller General opined this was

> so indefinite and uncertain as to bring it within the class of contracts prohibited by Section 3732, Revised Statutes, as follows: No contract or purchase on behalf of the United States shall be made, unless the same is authorized by law or is under an appropriation adequate to its fulfillment.

*Id.* The opinion goes on to say that

> it is a well-settled principle of law that the United States is not responsible for the negligence of its officers, employees, or agents and such liability can not be imposed upon it by one of its officers attempting to make it a part of the consideration of a contract.

*Id.* The opinion concludes "this portion of the contract is null and void, the contracting officer having exceeded his authority in entering into such an agreement." *Id.*

Approximately 15 years after the MOW contract was formed, the Comptroller General revisited the issue of open-ended indemnification clause enforceability in 35 Comp. Gen. 85 (Aug. 12, 1955). Here, the Comptroller General concluded "[w]ith respect to the indemnity provisions ... it may be stated for your future guidance that obligations of such indefinite and unlimited character consistently have been regarded by the accounting officers as objectionable in the absence of express statutory authority therefor" and held that "the contracting officer exceeded his authority in including such provisions in the [contract] and, accordingly, [the provisions] may not be recognized as imposing any

legal obligation on the Government." 35 Comp. Gen. 85 (Aug. 12, 1955).

These opinions demonstrate that, both before and after the MOW contract was entered into, open-ended indemnification clauses that were included in government contracts without appropriation or express statutory authority were considered void and unenforceable. Therefore, regardless of how shocking or disappointing the outcome, we have no choice but to conclude that the Indemnification Clause expressly written into the MOW contract and believed by both contracting parties to place such liabilities on the government, is nevertheless unenforceable because it had no funding or express statutory authority.

### VII

■ Plaintiff's final argument that the ADA does not prohibit recovery of its CERCLA costs relates to the Reimbursement Clause rather than the Indemnification Clause. Plaintiff asserts that, even assuming that the ADA prohibits open-ended indemnification clauses, this prohibition does not extend to the Reimbursement Clause of the contract. Pl. Br. (6/20/01) at 25. Plaintiff's argument is that the Act of July 2, 1940, Pub.L. No. 76–703, 54 Stat. 712, specifically authorized the use of the cost-plus-fixed-fee method of contracting and the Reimbursement Clause is simply a function of this method. *Id.* at 26. Plaintiff argues that because this represents statutory authorization, the Reimbursement Clause falls under the exception to the ADA "unless authorized by law." 31 U.S.C. § 1341.

Upon review on the Act of July 2, 1940, we regret that we cannot accept plaintiff's novel argument. Although section (a) of the Act provides for the use of CPFF contracts, it authorizes the Secretary of War to enter into such contracts only "out of the moneys appropriated for the War Department for national-defense purposes ...." 54 Stat. 712. With such an express limitation written into the Act, we cannot condone an interpretation that would circumvent the purpose of the ADA.

### VIII

Based on the foregoing, we reach the following conclusions. Supplement 22 to Contract No. W–ORD–490 has been lost or destroyed with no evidence of bad faith by either party. Federal Rule of Evidence 1004 provides for use of secondary evidence to prove the contents of Supp. 22. The nine documents put forth by plaintiff, authenticity of which has not been questioned by defendant, show strong evidence that a Preservation of Indemnity Clause was included in Supp. 22, thereby preserving Article III–A (8), the Indemnification Clause of the original contract. It is undisputed that Article IV–A (1)(k), the Reimbursement Clause, was preserved by the Unknown Claims Clause of Supp. 22.

We find that the Indemnification and Reimbursement Clauses evince an intent on the part of the government to assume nearly all risks for costs and other liabilities incurred as a result of plaintiff's participation in the war effort through the performance of this contract. We interpret these clauses broadly, and see no reason to exclude liability for CERCLA costs from the burdens that the government undertook by virtue of entering this contract. The clauses do not limit liability so as to exclude costs arising after termination of the contract. However, the Anti–Deficiency Act and its predecessors prohibit the inclusion of open-ended indemnification clauses in government contracts without specific appropriation or statutory authority. Even though the Indemnification Clause was included in this contract and it is quite reasonable to assume that both the contracting officer and the contractor believed this Clause to place the risk of virtually all liabilities on the government rather than the contractor, the state of the law compels us to hold this clause to be void and unenforceable. Finally, the Reimbursement Clause was not excepted from the prohibitions of the ADA by virtue of the Act of July 2, 1940.

Although we are of the opinion that the current state of the law compels the result expressed, this result is so totally at odds with the agreement the parties clearly made concerning reimbursement and indemnity, and plaintiff is so clearly entitled to the

indemnity it seeks under the plain language of the contract it had with the government, made during truly emergency, wartime conditions, we suggest that plaintiff may want to consider the avenue for potential relief available in a Congressional Reference case pursuant to 28 U.S.C. §§ 1492 & 2509.

## IX

Based on the foregoing, defendant's cross-motion for summary judgment filed on May 9, 2001 is GRANTED, and plaintiff's motion for partial summary judgment filed on March 30, 2001 is DENIED. Accordingly, judgment shall be entered in favor of defendant. Each party shall bear its own costs.

In light of the foregoing disposition, all remaining, unresolved motions are DECLARED TO BE MOOT.