**FORD MOTOR COMPANY, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 03–5092.

United States Court of Appeals, Federal Circuit.

DECIDED: Aug. 10, 2004.

Michael W. Kirk, Cooper & Kirk, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Charles J. Cooper and Elisebeth B. Collins.

Kyle Chadwick, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General; and David M. Cohen, Director. Of counsel was Timothy P. McIlmail, Attorney.

Before NEWMAN, SCHALL, and LINN, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Ford Motor Company appeals the decision of the United States Court of Federal Claims, denying Ford's claim for certain environmental cleanup costs arising from a World War II bomber contract at Willow Run in Ypsilanti, Michigan.[1] We conclude that Ford is entitled to recover the costs of the environmental cleanup that was required by Federal and State agencies. The decision of the Court of Federal Claims is reversed.

## BACKGROUND

In 1941 Ford and the United States Army Air Force entered into Contract No. W535–ac–21216 (the War Contract), a cost-plus-fixed-fee contract to manufacture B–24 Liberator bomber airplanes and spare parts. At the government's direction Ford built the Willow Run Bomber Plant and leased it back from the government for conduct of the contract. Ford also built, leased back, and operated a waste treatment plant to process industrial and sanitary waste from the bomber plant. The manufacturing process included aluminum anodizing and zinc cyanide plating, and produced a discharge of acid and cyanide chemical waste to the waste treatment plant and to a sludge lagoon and surrounding areas. After the war ended, the parties entered into agreements terminating the War Contract. Relevant are various contractual and statutory provisions with respect to later-arising claims.

In 1988 the Michigan Department of Natural Resources, together with the United States Environmental Protection Agency acting under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq., notified Ford and six other entities of certain environmental damage obligations, including cleanup of chemical waste from the War Contract operations at Willow Run. Ford's liability was due solely to the waste and effluent produced during performance of the War Contract. In March 1995 all of the charged entities entered into a consent judgment of liability, and in November 1997 the allocation of cleanup costs was resolved by binding arbitration, with Ford assigned 9.763% of the total. Ford states that it "expended almost $7.2 million defending and discharging the claim." The only issue on appeal of the summary judgment is whether the government is required to reimburse Ford for these costs flowing from the War Contract.

While the state and federal environmental proceedings were pending, on January 20, 1994 Ford wrote to the Air Force Materiel Command, addressed to the "Successor to the Contracting Officer" for the War Contract and stating "this notice is given as provided by the terms of the

1. *Ford Motor Co. v. United States,* 56 Fed. Cl. 85 (2003).

contract." Ford recited the cleanup issues, reported the ongoing legal proceedings, requested a meeting, and requested reimbursement of the anticipated cleanup assessment. Ford asked that the report of the legal proceedings be furnished to the Judge Advocate General, as required by the procurement regulations. There was no response to this letter.

On March 16, 1995 Ford again wrote to the Air Force, providing updated information concerning the consent judgment of liability. On August 10, 1995 the Director of Contract Law for the Air Force Materiel Command responded by letter; he agreed to serve as the "point of contact," and summarily denied Ford's request for reimbursement. He stated that there was "no basis for recovery or the appointment of a contracting officer."

Meanwhile, the federal and state proceedings continued. In March 1998, after completion of the multi-party arbitration and allocation, Ford wrote to the Director of Contract Law for the Materiel Command, advising of Ford's share of the cleanup costs and requesting reimbursement. Ford directed attention to the Contract Settlement Act of 1944, 41 U.S.C. § 113 (the CSA), and requested written findings in accordance with the provisions of the CSA. Six days later Ford filed a complaint in the United States Court of Federal Claims. That case was dismissed without prejudice in October 1998, and in November 1998 Ford resubmitted to the Air Force a request for written findings under the CSA. The Air Force did not respond to these requests.

In March 1999 Ford filed this suit in the Court of Federal Claims. In Count I, Ford charged the United States with breach of contract for failure to reimburse the environmental cleanup costs as required by the War Contract and the Termination Agreements. Count II was for failure to pay "fair compensation" in violation of § 133(b)

of the CSA. Count III alleged a taking without just compensation in violation of the Fifth Amendment. Count IV alleged a taking without due process of law in violation of the Fifth Amendment. Count V alleged failure to reimburse in violation of the Public Debt Clause of the Fourteenth Amendment.

Both sides moved for summary judgment as to Counts I, II, and III. Neither side addressed Counts IV and V, and the Court of Federal Claims held these counts abandoned. The court granted summary judgment in favor of the government on Counts II and III, and dismissed Count I without prejudice. This appeal followed.

## DISCUSSION

■■■■ On appellate review of judgments of the Court of Federal Claims, issues of contract interpretation receive plenary review, as a matter of law. *Mass. Bay Transp. Auth. v. United States,* 254 F.3d 1367, 1372 (Fed.Cir.2001). Summary judgments also receive plenary review, the appellate tribunal applying the same criteria as did the trial court, with all justifiable factual inferences drawn in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A

The parties debate whether Ford followed appropriate procedures. Ford states that it gave notice of the claim in accordance with the provisions of the CSA, and that the government's refusal to provide findings as required by the statute, and its summary denial of the claim, satisfied the procedural requirements.

Under the CSA, if a claim has not been settled by agreement, a contractor may submit a demand for written findings from the contracting agency. The claim is sub-

sequently time-barred if the contractor fails to initiate civil proceedings within ninety days after delivery of the findings or, if no findings are provided, within one year after the demand for findings. The relevant provisions are (with emphases added):

41 U.S.C. § 113(a). Failure to settle claims by agreement; preparation of findings; notice to war contractor

Whenever the contracting agency responsible for settling any termination claim has not settled the claim by agreement or has so settled only a part of the claim, (1) the contracting agency at any time may determine the amount due on such claim or such unsettled part, and prepare written findings indicating the basis of the determination, and deliver a copy of such findings to the war contractor, or (2) if the termination claim has been submitted in the manner and substantially the form prescribed under this chapter, the contracting agency, upon written demand by the war contractor for such findings, shall determine the amount due on the claim or unsettled part and prepare and deliver such findings to the war contractor within ninety days after the receipt by the agency of such demand. . . .

(b) Rights of war contractor

Whenever any war contractor is aggrieved by the findings of a contracting agency on his claim or part thereof or by its failure to make such findings in accordance with subsection (a) of this section, he may bring suit against the United States for such claim or such part thereof, in the United States Court of Federal Claims or in a United States district court, in accordance with sections 1346, 2401, and 2402 of Title 28. . . .

(c) Procedure

Any proceeding under subsection (b) of this section shall be governed by the following conditions:

\* \* \*

(2) A war contractor may initiate proceedings in accordance with subsection (b) of this section (i) within ninety days after delivery to him of the findings by the contracting agency, or (ii) in case of protests or appeal within the agency, within ninety days after the determination of such protest or appeal, or (iii) in case of failure to deliver such findings, within one year after his demand therefor. . . .

The government states that the Air Force was not required to respond to Ford's 1998 demands for findings, that Ford tendered its claim in January 1994, and that when the Air Force denied the claim in August 1995, Ford had 90 days in which to seek judicial review. Ford states that the government's proposed procedure is not that of the statute, and is incorrect.

■ The CSA statute makes clear that a demand for written findings is a necessary predicate to bringing a claim under the CSA. Ford's January 1994 and March 1995 letters to the Air Force do not contain a demand for findings, and were written before the cost of the cleanup was assessed. The demand for findings was made in March 1998 after Ford's monetary allocation was established, and was repeated in November 1998.

In *Somerset Mach. & Tool Co. v. United States,* 144 Ct.Cl. 481 (1959), on which the government relies in arguing that Ford's claim is time-barred, the plaintiff submitted termination claims under the CSA, and in February 1956 the contracting officer notified the plaintiff that its claim was denied. Suit was not filed until January 1958, and the court held that the claim was barred. The February 1956 denial letter

apparently contained the findings required by the CSA, for the court held that the plaintiff was required to bring suit "within 90 days from the date of delivery to him of the findings of the contracting officer." *Id.* *Somerset* better supports Ford's position than that of the government. *See also Monolith Portland Midwest Co. v. Reconstruction Finance Corp.*, 178 F.2d 854, 859 (9th Cir.1949) (a contractor's "right to maintain ... action depends upon whether it has submitted a termination claim in the manner prescribed under the [CSA], and has made a written demand for findings").

Although the Court of Federal Claims held that Ford should have proceeded under the Contract Disputes Act and its procedures, 41 U.S.C. §§ 601–613, the court also held that if the CSA does apply, then upon the Air Force's failure to provide the requested findings and its unconditional denial of Ford's claim, the appeal to the Court of Federal Claims was not time barred. As we discuss in Part B, the Court of Federal Claims erred in finding that Ford's claim was not subject to the CSA. The Government does not allege that Ford requested written findings in either its January 1994 or March 1995 letters; Ford's only request for written findings occurred in March 1998. Because Ford timely filed its case following its 1998 request for written findings, the Court of Federal Claims was correct in concluding that Ford's claim is not time-barred under the provisions of the CSA.

**B**

■ Both the government and Ford stated at trial that the CSA governs Ford's claim. The Court of Federal Claims held that the CSA is not applicable because the War Contract was terminated and final Termination Agreements were entered into in 1945 and 1946. We agree with Ford and the government that the CSA applies, and that the Termination Agreements are construed in the context of the

CSA. The CSA defined "termination claim" as follows:

> (h) The term "termination claim" means any claim or demand by a war contractor for fair compensation for the termination of any war contract and any other claim under a terminated war contract, which regulations prescribed under this chapter authorize to be asserted and settled in connection with any termination settlement.

41 U.S.C. § 103(h) (1944). The Termination Agreement between Ford and the Air Force provided for recovery of reimbursable costs that were not then known:

> (4) Claims of the Contractor against the Government which are based upon responsibility of the Contractor to Third parties ... and which involve costs reimbursable under the Contract ... but which are not now known to the Officers, Directors, or other personnel of the Contractor whose duties include the acquisition of such knowledge.

Termination Agreement, article 4(c)(4) (May 7, 1946).

Article 4(c)(4) of the Termination Agreement, which reserved unknown claims from a general release of claims, preserved Ford's claim for payment under the War Contract. The Court of Federal Claims acknowledged that Ford was asserting a claim for payment under the provisions of the War Contract. Because Ford's claim was exempted from settlement by the terms of the Termination Agreement, the government's liability under the CSA was not released. Thus, the Court of Federal Claims' conclusion that the CSA was not applicable was in error.

**C**

■ The Court of Federal Claims held that the provision in the Termination Agreement for reimbursement of costs

"which are not now known" is limited to liability that existed at the time of termination of the wartime contract or "in close temporal proximity to contract performance," and does not extend to this later-arising environmental liability because this liability did not exist and was not contemplated at the time of termination. The Court of Federal Claims held that all known claims under the War Contract were settled in the Termination Agreements, and that the CSA does not provide any basis for payment of these later-arising environmental cleanup costs. The court pointed to the fifty-year gap between contract completion in 1945 and the environmental cleanup assessment in the 1990s, and concluded that the government is not liable because of a lack of temporal relationship between the environmental liability and contract performance.

Ford points out that the CSA explicitly contemplated later-arising claims, and set no period of limitations. Ford states that the Court of Claims has held that an unknown claim need not be in existence at the time of contracting to be covered by an indemnification clause. In *United States Rubber Co. v. United States,* 142 Ct.Cl. 42, 160 F.Supp. 492 (1958), the wartime contract included an unknown claims provision nearly identical to that of the Termination Agreement in this case. Although the government had argued that later-arising claims were barred, the Court of Claims held that the government's liability to the contractor was "not diluted by the intervention of time" and awarded the contractor its after-arising costs. *Id.* at 499–500. Ford argues that the unknown costs and damage to property provisions in its War Contract were broadly stated, for their purpose was to provide appropriate assurance to wartime contractors as to indemnification for property damage claims incident to the contract, whether those claims arose before or after termination.

The government argues that article 4(c)(4) of the 1946 Termination Agreement should be strictly construed to apply only to already-existing claims that were unknown at the time of termination. The government states that Ford's claim is not an "unknown" claim under the Termination Agreement because it did not exist until after environmental laws were later enacted. The government also argues that Ford's claim is not "reimbursable under the Contract" pursuant to CSA article 3(b)(13) because "damage to property" means tort claims, not later-arising environmental claims.

These principles were again considered in *E.I. DuPont de Nemours & Co. v. United States,* 365 F.3d 1367 (Fed.Cir.2004), where the indemnity provision in a World War II contract to produce chemicals for munitions provided that: "the Government shall hold [DuPont] harmless against any loss, expenses ... or damage of any kind whatsoever arising out of or in connection with the performance of the work under this Title...." In *DuPont* this court confirmed the government's obligation of indemnification for a later-arising CERCLA claim. 365 F.3d at 1373–74. The corresponding clause in Ford's contract refers to property damage, *see* article 3(b)(13) (allowable costs include "loss or destruction of or damage to property as may arise out of or in connection with the performance of the work under this contract"), and covers the CERCLA claim here at issue.

The Termination Agreement with Ford by its terms includes all claims "not now known" arising from performance of the War Contract; there is no temporal limit as to when the claims would become known, provided their origin is performance of the War Contract. This differs from the contract provision in the case relied upon by the government, *Chrysler Corp. v. Ford Motor Co.,* 972 F.Supp. 1097

(E.D.Mich.1997), where the contractual assumption of liability was limited to claims "existing on the closing date" of the sale of the land, the court finding that the mutual understanding was to provide only for known claims. In contrast, Ford's Termination Agreement explicitly refers to unknown costs. The passage of time did not negate Ford's liability, and does not defeat the government's obligation of reimbursement. Precedent reflects this principle. In *American Trucking Ass'n, Inc. v. Smith*, 496 U.S. 167, 220, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990) the Court held that a limitations period will not be inferred when not required by statute and when it would be inequitable to do so. In *Houdaille Indus., Inc. v. United States*, 138 Ct.Cl. 301, 151 F.Supp. 298, 312 (1957) the Court of Claims held that "so long as the expenditure arose on account of the contractor's performance under the contract, and the expenditure is not otherwise excluded from payment by other provisions, the mere fact that liability cannot be determined until after the termination or completion date of the contract is no reason to penalize the contractor to the extent of its subsequent payments which are attributable to the Government contract." We conclude that Ford's claim for reimbursement is not barred merely because the originating events are long past, for the liability for cleanup did not arise until after enactment of CERCLA and other environmental laws, and the claim was timely made after it arose.

## D

■ The government does not press the Anti–Deficiency Act, 31 U.S.C. § 1341, although it was raised before the Court of Federal Claims. That court stated that indemnification is likely to be barred by the Anti–Deficiency Act because the parties to the War Contract could not have contemplated governmental liability for unknown future claims. This aspect was resolved in *DuPont*, 365 F.3d at 1374, where this court held that the Anti–Deficiency Act does not bar recovery under the CSA of environmental cleanup costs arising from performance of a contract during World War II. The ruling is similarly applicable here.

Conclusion

The Court of Federal Claims erred in holding that this later-arising claim is not reimbursable. The War Contract, its termination conditions, the Contract Settlement Act of 1944, and precedent, establish the government's liability. The contrary decision of the Court of Federal Claims is reversed. We remand for implementation of judgment in favor of Ford, including any appropriate review of the quantum of recovery.

*REVERSED AND REMANDED.*

SCHALL, Circuit Judge, dissenting.

I agree with the majority that the Contract Settlement Act of 1944 applies to Ford's claim, and that Ford's complaint was timely filed. I am unable to agree, however, that Ford is entitled to recover its contribution to the CERCLA settlement under the terms of the War Contract. Because I do not agree with the majority's interpretation of the War Contract, I respectfully dissent from its conclusion that pursuant to the indemnification clause in the Termination Agreement, the government must reimburse Ford for its contribution to the CERCLA settlement. I therefore would affirm the judgment of the Court of Federal Claims.

In cases in which the United States is a party to a contract, we apply general rules of contract construction. *Scott Timber Co. v. United States*, 333 F.3d 1358, 1366 (Fed. Cir.2003) (citing *Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed.Cir.1997)). "When the United States

enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *United States v. Winstar Corp.*, 518 U.S. 839, 895, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (quoting *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934)). "A principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed." *Winstar Corp. v. United States*, 64 F.3d 1531, 1540 (Fed.Cir.1995) (en banc) (citing *Arizona v. United States*, 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978)). In this case, it cannot be questioned that neither Ford nor the government could have intended for the indemnification clause in the Termination Agreement to cover claims against Ford based on CERCLA liability. CERCLA was not enacted until 1980, thirty-three years after the termination of the War Contract. This fact does not alone, however, preclude the indemnity from encompassing Ford's claims against the government for reimbursement of its contribution to the CERCLA settlement.

It is one thing to interpret CERCLA section 107(e)(1), as we have, as permitting the government to indemnify a private party for costs assessed pursuant to CERCLA. *E.I. DuPont de Nemours & Co. v. United States*, 365 F.3d 1367, 1372 n. 10 (Fed.Cir.2004) (interpreting 42 U.S.C. § 9607(e)(1) (2000)).[2] It is another question altogether, however, whether an indemnification provision entered into more than thirty years prior to the passage of CERCLA can encompass CERCLA costs. While I agree with the courts that allow for the possibility of CERCLA costs being within the scope of an indemnification provision executed before the passage of CERCLA, I do not think that the contract language in the Termination Agreement and War Contract in this case is sufficient to accomplish that result.

As noted above, the laws of contracts generally applicable to private parties also determine the government's rights and responsibilities when it enters into contracts. *See Winstar*, 518 U.S. at 895, 116 S.Ct. 2432. Courts have held that indemnification provisions entered into between private parties prior to the passage of CERCLA may cover costs assessed pursuant to that statute. *See, e.g., Dent v. Beazer Materials & Servs., Inc.*, 156 F.3d 523, 534 (4th Cir.1998); *Beazer E., Inc. v. Mead Corp.*, 34 F.3d 206, 211 (3d Cir.1994), *cert. denied*, 514 U.S. 1065, 115 S.Ct. 1696, 131 L.Ed.2d 559 (1995); *Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 327 (7th Cir.1994); *Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 356–58 (D.N.J.1991). One of two types of indemnification provisions is required. The indemnification language must either be "specific enough to include CERCLA liability or general enough to include any and

---

**2.** Section 107(e)(1) of CERCLA reads as follows:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1). For a listing of cases interpreting this language to prohibit a party from escaping liability to the government, while at the same time permitting contractual transfers of financial responsibility among private parties, see *Interstate Power Co. v. Kansas City Power & Light Co.*, 909 F.Supp. 1241, 1264 (N.D.Iowa 1993), which lists each circuit that has come to that conclusion. *But see Olin Corp. v. Consol. Aluminum Corp.*, 807 F.Supp. 1133, 1137–39 (S.D.N.Y.1992) (discussing three different approaches before settling on the approach from *Interstate Power*).

all environmental liability. . . ." *Beazer E.*, 34 F.3d at 211. The key is whether the indemnity contains limiting language, or whether it demonstrates an intent to allocate *all* possible liabilities among the parties. *See Elf Atochem N. Am. v. United States*, 866 F.Supp. 868, 870–71 (E.D.Pa. 1994). If there is limiting language in the indemnity, without a specific provision for CERCLA costs, it does not encompass them. *Id.* (citing *Purolator Prods. Corp. v. Allied–Signal, Inc.*, 772 F.Supp. 124, 130 (W.D.N.Y.1991)).

The indemnification provision in the Termination Agreement preserves

> (4) Claims of [Ford] against the Government which are based upon responsibility of [Ford] to Third parties . . . and which involve *costs reimbursable under the Contract,* including without being limited thereto, wage adjustments which are approved by properly constituted Government Departments or Agencies or determined to be payable under the Davis–Bacon Act, but *which are not now known* to the Officers, Directors, or other personnel of [Ford]. . . .
>
> \*　\*　\*　\*　\*　\*
>
> (1) In addition to the payment of the sum provided for in Article 4, the government will reimburse [Ford] for costs incurred in discharging claims described in subparagraphs (c)(1), (c)(3), (c)(4), (c)(6), (c)(7), and (c)(16) of said Article.

Supplemental Agreement No. 69, arts. 4(c)(4), 5(1) (May 7, 1946) (emphases added). In other words, upon the termination of the War Contract, Ford retained its claims against the government for costs that were reimbursable under the War Contract but were not known at the time of the Termination Agreement. This indemnity provision thereby directs the court to the reimbursable costs provisions of the War Contract. Ford contends that the following provision from the War Contract encompasses its contribution to the CERCLA settlement:

> (13) . . . costs and expenses incurred in the defense and/or discharge of such claims of others on account of death or bodily injury of persons or *loss or destruction of or damage to property as may arise out of or in connection with the performance of the work under this contract* shall be an allowable item of cost hereunder. . . .

Supplemental Agreement No. 4, art. 3(b)(13) (emphasis added). According to Ford, costs assessed pursuant to CERCLA fall within the "loss or destruction of or damage to property" clause in this provision because they arose as a direct result of Ford's performance of the War Contract.

I do not agree. This language fails to transfer the responsibility for paying Ford's CERCLA costs to the government. It neither specifically mentions CERCLA, nor is it broad enough to include "any and all environmental liability. . . ." *Beazer E.*, 34 F.3d at 211. The provision is one of fourteen reimbursable cost provisions in article 3(b) of the War Contract. In these provisions, the parties to the contract set forth in detail the specific costs for which the government would reimburse Ford. The reimbursable cost provisions demonstrate that the parties to the War Contract did not intend to shift *all* liabilities to the government, but only those explicitly listed in the War Contract as reimbursable. Moreover, the language of article 3(b)(13) is limiting. Only costs for the "loss or destruction of or damage to property" are reimbursable. Under these circumstances, CERCLA costs do not fall within the ambit of "costs reimbursable under the Contract" under the Termination Agreement. Accordingly, I would rule that the indemnification provision in this case is insufficient to transfer the financial responsibility for Ford's CERCLA costs to the United States.

My conclusion is consistent with this court's recent decision in *DuPont*. The language of the indemnification clause in *DuPont* included claims against "any loss, expense (including expense of litigation), or damage (including damage to third persons because of death, bodily injury or property injury or destruction or otherwise) of any kind whatsoever...." 365 F.3d at 1372. We concluded that such limitless language was sufficiently broad to include the contractor's CERCLA liability. *Id.* at 1372–73 (citing, *inter alia*, *Beazer E.*, 34 F.3d at 210; *Elf Atochem*, 866 F.Supp. at 870). In my view, the narrow indemnification language in this case compels a contrary conclusion. My view is also consistent with *Elf Atochem*, which this court cited in *DuPont* and which also involved a party (the government) claiming reimbursement for CERCLA costs pursuant to a World War II contract. 866 F.Supp. 868. Similar to the one in this case, the indemnity clause there provided that

> Lessee [Elf Atochem] agrees to save Defense Corporation [United States] harmless against any liability whatsoever because of accidents or injury to persons or property occurring in the operation or use of the [leased] Machinery by Lessee....

*Id.* at 870. The government argued that this indemnity covered liability under CERCLA. *Id.* Relying on *Beazer East*, 34 F.3d 206, the court determined that this language did not "clearly or unequivocally" allocate "all present and future claims": "It is not a broad waiver of 'all liabilities of any type whatsoever,' but rather a waiver of all liabilities of a specific nature." *Id.* at 871. Because the clause did not specifically include CERCLA, the court concluded that the clause did not indemnify the United States for CERCLA costs.[3] *Id.*

The court in *Elf Atochem* further relied on *Mobay*, which also involved indemnification language very similar to the reimbursable costs provision in Ford's War Contract. In *Mobay*, Harmon Color Works, which later merged into Mobay Corporation, had purchased the site at issue from Allied Chemical Corporation, a predecessor of Allied–Signal, Inc., pursuant to a purchase agreement dated 1976 and an assumption agreement dated 1977. 761 F.Supp. at 348. The agreement stated that Harmon Color Works would indemnify Allied Chemical from

> (2)(b) all obligations and liabilities relating to the Haledon Plant or Haledon Products arising out of claims made, or suits brought, on or after the Closing Date for (i) injury, sickness, disease or death of any person, or (ii) *any damages to any property*, in either case which is ultimately determined by the finder of fact to have resulted from any condition existing, substance consumed or dis-

---

3. *But see Olin Corp. v. Yeargin Inc.*, 146 F.3d 398, 408–09 (6th Cir.1998) ("Applying these rules to the indemnification agreement in the instant case, we find that, while there is no specific reference in the agreement to environmental liability, the language is sufficiently broad to encompass the environmental liabilities suffered here. In the contract, Yeargin agrees to 'indemnify and hold Owner harmless from *any and all loss, damage, liability, claims, demands, costs, or suits of any nature whatsoever* asserted by employees of Contractor or any third persons ... *for property damage, personal injury or death, or otherwise.*'" (emphasis in original)) (Contie, J., dissenting (relying on *Beazer East, Elf Atochem,* and *Mobay* to conclude that the indemnity did not extend to CERCLA liabilities)); *Joslyn Mfg. Co. v. Koppers Co., Inc.*, 40 F.3d 750, 754–55 (5th Cir.1994) (construing similarly worded indemnities in lease agreements executed prior to 1950 for, in part, "death, injury, loss or damage, resulting to the ... employees or property" and for "injury, death, damage, loss or destruction (a) suffered or caused by or to any person or property" as encompassing CERCLA liability).

charged, product manufactured or action taken or omitted....

*Id.* (emphasis added). Allied–Signal asserted that the assumption agreement transferred liabilities for environmental claims to Harmon Color Works. *Id.* at 355. The court concluded that the indemnification did not encompass environmental liabilities, for it neither mentioned environmental liabilities specifically nor broadly waived all liabilities. *Id.* at 355–58, 358 n. 15. Rather, "Mobay's predecessor only assumed liabilities for personal injury and property damage to third parties...."[4] *Id.* at 358.

Accordingly, because I do not agree with the majority's interpretation of the Termination Agreement and War Contract, I respectfully dissent from the majority's conclusion that pursuant to the indemnification in the Termination Agreement, the government must reimburse Ford for its contribution to the CERCLA settlement. As indicated above, I therefore would affirm the judgment of the Court of Federal Claims.

---

4. My conclusion is also consistent with the holdings of various courts extending the scope of extremely broad pre-CERCLA indemnification provisions to reach CERCLA costs. *See, e.g., White Consol. Indus., Inc. v. Westinghouse Elec. Corp.,* 179 F.3d 403, 409–10 (6th Cir.1999) ("All obligations and liabilities of the Business, contingent, or otherwise, which are not disclosed or known...."); *Dent,* 156 F.3d at 534 ("[Beazer] agrees to save [Conoco] harmless from any and every claim arising out of the use by [Beazer] of the demised premises...."); *SmithKline Beecham Corp. v. Rohm & Haas Co.,* 89 F.3d 154, 159–60 (3d Cir.1996) ("All material liabilities relating to the conduct of the Business ..."; "All losses, liabilities, damages or deficiencies ... resulting from the operation of the Business...."); *Olin,* 807 F.Supp. at 1142–43 ("[A]ll claims of any nature which Conalco now has or hereafter could have against Olin ... under or arising out of the Purchase Agreement...."); *Purolator Prods.,* 772 F.Supp. at 131–32 ("Facet hereby assumes and agrees to satisfy all liabilities and obligations of Bendix ... relating to or arising out of the Assets ...."); *see also Kerr–McGee,* 14 F.3d at 326–28 (finding the indemnification language "any and all claims, damages, judgments, fines, penalties, assessments, losses, expenses, including interest, court costs and attorney fees ... arising out of or resulting from, directly or indirectly ... (b) the maintenance of any action, claim or order concerning pollution or nuisance" sufficient to cover CERCLA costs because it expressly referred to "pollution or nuisance").